NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0069n.06

No. 09-6404

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 02, 2011**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DIANNA VORHOLT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| v. | ) | District of Kentucky |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before:    BOGGS and COOK, Circuit Judges; and CARR, District Judge.[*]

BOGGS, Circuit Judge.   In April 2004, Dianna Vorholt filed an application for disability insurance benefits.  The Social Security Administration denied Vorholt's application, and, after exhausting her administrative remedies, Vorholt filed suit against the Commissioner of Social Security in district court.   The district court granted summary judgment in favor of the Commissioner, and we affirm.

I

Vorholt has been diagnosed with a variety of psychological conditions, including bipolar disorder and post-traumatic stress disorder.  Vorholt filed an application for disability insurance

---

[*] The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

benefits on April 19, 2004, and claimed that, as a result these conditions, she became disabled on December 12, 2003.

The Social Security Administration denied Vorholt's application on September 3, 2004, and then again upon reconsideration on November 10, 2004. Two weeks later, Vorholt requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted a pre-hearing on September 21, 2006, and a hearing on December 11, 2006. On February 23, 2007, the ALJ concluded that Vorholt was not disabled.

Vorholt's medical history reflects substantial drug abuse. Although Vorholt sought drugs for pain relief, the ALJ found that "there is no valid diagnosis and no diagnostic testing to explain [her] alleged pain." Vorholt refused to take part in alternative pain treatments, and at least one of her doctors concluded that there was a "very strong psychological contribution" to her pain.

On December 30, 2003, Vorholt was admitted to a Veterans Administration hospital for psychiatric evaluation. Prior to the visit, she had stopped taking her antidepressant medications. The treating doctor noted that Vorholt had been "constantly med seeking since admission" and was giving conflicting messages. Vorholt admitted that she had been abusing Klonopin, a drug used to treat seizures and panic disorders, and that she smoked marijuana once or twice weekly. On January 3, 2004, Vorholt left the hospital—against medical advice—because she was not receiving the "right" kind of medication.

On April 6, 2004, Vorholt returned to the VA hospital. She had previously stopped taking a prescribed antidepressant and had also failed to keep her medical appointments. As a result, she suffered from an episode of mania.

On September 9, 2004, Vorholt visited Dr. Bergquist at the VA hospital and requested more Vicodin. Vorholt admitted that she had doubled her dosage. Vorholt exhibited a slow gait early in her visit with the doctor, but that condition disappeared when she left the examination area.

On November 12, 2004, Vorholt requested medication from Dr. Wang at the VA hospital. Wang refused to give her the medication because her prescription had been filled only eight days earlier. Wang observed that Vorholt was "[a]lert and oriented," exhibited no psychosis, and that her "insight and judgment [were] intact."

On December 5, 2004, Vorholt sought emergency treatment for a chest pain and headache. Tests indicated no physical problems, and she did not appear to be in distress. She requested pain medication and was given Demerol and Phenergan I.M.

On December 6, 2004, Vorholt was hospitalized for depression. Doctors reported at the time that she "twisted info" to gain smoking privileges. She denied current use of drugs and alcohol, but her urine tested positive for cocaine, marijuana, and Zoloft, and her husband said she had been using alcohol and cocaine. She was given medication and discharged on December 10, 2004.

Three days after leaving the hospital, Vorholt again requested medication from Dr. Wang. Vorholt told Wang that she was not given medication by the hospital, but Wang noted in Vorholt's record that the computer system indicated otherwise. Dr. Wang further noted that she should have had at least of 20 days of medication left, that "her drug seeking behavior has been noticed before," and that her drug screen was positive for narcotics. Wang also observed that Vorholt exhibited no psychosis and that her "thought process [was] goal directed and logical."

By March 2005, Vorholt appeared to be in much better shape. At that time, she reported that she was no longer smoking or taking Vicodin or Lorazepam. Dr. Klein found that Vorholt needed to be monitored, but was stable enough to participate in psychotherapy. She also noted that Vorholt's "substance use seems to be connected with episodes of mania."

Vorholt began psychotherapy and, by August 2005, a doctor at the VA hospital reported that she looked better than he had ever seen her. In September 2005, Vorholt may have started treatment in a pain clinic, although the evidence of her entry into such a program is unclear. As late as April 21, 2006, Vorholt reported that she was experiencing no serious emotional problems.

However, Vorholt's substance abuse patterns soon returned. On May 19, 2006, Vorholt met with a nurse and reported that she had been self-medicating with up to eight Vicodin tablets per day. She requested morphine, but was refused. Later that same day, she went to St. Luke Hospital and was given morphine, Phenergan, and Vicodin.

On June 8, 2006, Vorholt's urine tested positive for THC and she admitted to the pain clinic that she had used marijuana for 26 out of the prior 30 days. She also tested positive for Oxycodone, which had not been prescribed. Vorholt told clinic personnel that Dr. McKeen had doubled her prescribed Vicodin dose and that Dr. Klein wanted her to take morphine. Vorholt provided no evidence to the hospital to support either of these claims, and Dr. Klein later denied supporting Vorholt's use of morphine. The hospital noted that Vorholt was "very focused on [obtaining a] prescription of Morphine," and that she would be refused opiates until she received substance-abuse treatment.

On August 7, 2006, Dr. Klein reported that Vorholt was running out of Lorazepam early.

On August 14, 2006, Vorholt again tested positive for marijuana and Dr. Shukla noted that Vorholt was "rationalizing and denying . . . her marijuana use," and that she was psychologically dependent on medications.

Vorholt's September 17, 2006, urine screen was clean. On September 21, 2006, Vorholt requested Vicodin from Dr. Kreines, an on-call doctor, but was refused.

On October 10, 2006, Vorholt went to the St. Luke emergency room for a headache and was given morphine. After receiving the morphine, Vorholt told doctors that she had developed a left-sided chest pain and was given additional morphine, although the attending doctor noted that Vorholt's pain was atypical and the she had a negative cardiac workup. Vorholt's October 23, 2006, urine screen was clean. Vorholt later stated that she had stopped taking Vicodin a few days prior to her clean urine screens because she took extra Vicodin and ran out early.

Two medical assessments were performed by treating physicians. On October 14, 2004, Dr. Baluyot completed a medical assessment on Vorholt. Baluyot stated that she had been treating Vorholt since 2001 and concluded that Vorholt had poor or no ability to perform most workplace functions. In an opinion dated August 21, 2006, Dr. Klein stated that she treated Vorholt from March 25, 2005, to August 21, 2006, and concluded that Vorholt is "unable to work in any setting and [I] anticipate this disability will last for at least one year and likely longer."

On June 28, 2004, Dr. Deters, a non-treating physician, examined Vorholt on behalf of the Social Security Administration. Deters concluded that "Vorholt does not seem likely to adapt to the pressures normally found in a day to day work setting . . . . She is capable of understanding and

remembering simple instructions, but she has more difficulty with complex directives" and "she is not able to . . . complet[e] tasks in the normal amount of time."

Two non-treating state agency doctors completed medical assessments of Vorholt. On August 27, 2004, Dr. Ross examined Vorholt's medical records and concluded that she was "not significantly limited" in 17 of 20 areas of workplace functioning, and only "moderately limited" in the remaining three areas: ability to concentrate for extended periods, ability to be punctual, and ability to interact appropriately with the general public. Ross noted that Vorholt's problems were not new, yet she had been working until very recently, and concluded that, even when abusing substances, Vorholt is capable of performing basic workplace functions. On October 29, 2004, a second state agency physician examined Vorholt's medical records to prepare a medical assessment. The second physician reached the same conclusions as Dr. Ross, that Vorholt was not significantly limited in most areas, and no more than moderately limited in others.

The ALJ explicitly considered all of the above to reach her decision. As required by the regulations, the ALJ performed the required five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520. In steps one through three, the ALJ found that Vorholt had not engaged in "substantial gainful activity" since the onset date, and that Vorholt suffers from severe impairments, but not from a listed impairment that would mandate a finding of "disabled." Before beginning the step-four analysis, the ALJ determined Vorholt's residual functional capacity ("RFC"). *See* 20 C.F.R. § 1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity.").

In determining Vorholt's RFC, the ALJ determined that Vorholt had a serious drug abuse problem. At both the pre-hearing and the hearing before the ALJ, Vorholt stated that she had never taken more prescription drugs than prescribed and had never requested early refills of prescription drugs. Vorholt also denied failing to comply with any treatment recommendations. She also denied having used marijuana since she was eighteen, more than twenty years earlier. As these statements were belied by the record, the ALJ concluded that Vorholt was not credible regarding her drug use, and that as a result, her credibility regarding her symptoms was highly suspect. The ALJ noted that Vorholt was in denial about her drug problem, a conclusion previously stated by at least one of Vorholt's treating doctors.

The ALJ gave little weight to medical opinions by Drs. Baluyot and Klein. Dr. Baluyot's opinion from October 2004 was silent as to the nature and frequency of Vorholt's drug abuse, which the record indicates was rampant during this time. Accordingly, the ALJ concluded, Baluyot's opinion was not an accurate summary of her impairments. Dr. Klein's opinion from August 2006 concluded that Vorholt was "disabled" and could not perform any work, but despite her earlier notes that Vorholt's mania was connected to her substance abuse, Klein did not address that issue in her opinion. As a result, the ALJ concluded that Klein's opinion also merited little weight.

The ALJ also gave little weight to Dr. Deters's medical report because Vorholt misrepresented her substance abuse history to Deters, "and much of his opinion appears to rest on the information the claimant provided to him, not necessarily from all her treatment records." Further, Deters's observations of Vorholt indicated that she had a good memory, was attentive, could

reason, showed adequate judgment, and could complete tasks independently, and the ALJ concluded that his report was therefore internally inconsistent.

In determining Vorholt's RFC, the ALJ gave the state agency physicians' opinions significant weight, finding that they were consistent with the record. The ALJ concluded that Vorholt had no exertional limitations, but should avoid exposure to heights and moving machinery due to her seizure disorder. Based on this RFC, the ALJ concluded in step four that Vorholt could perform her past relevant work as a phlebotomist. Additionally, the ALJ took testimony from a vocational expert, who testified that a person with the nonexertional limitations that the ALJ attributed to Vorholt could perform occupations such as light cleaner, sedentary assembler, and medium cleaner, and that each of these jobs existed in significant numbers in the regional and national economies. Accordingly, the ALJ concluded in step five that Vorholt was capable of adjusting to new available work.[1] The ALJ therefore held that Vorholt was not disabled.

The ALJ's opinion became the final decision of the Commissioner of Social Security on September 9, 2008, when the Appeals Council declined to review the decision.

Vorholt next sought review in the district court, and both she and the Commissioner filed motions for summary judgment. In her motion for summary judgment, Vorholt argued that the ALJ improperly discounted the opinions of Drs. Baluyot and Klein and failed to use medical evidence when determining Vorholt's RFC.

---

[1]The ALJ's finding in step four of the sequential evaluation process, that Vorholt could perform her past relevant work, alone mandated the conclusion that Vorholt was not disabled. 20 C.F.R. § 1520(a)(4)(iv). The ALJ's finding in step five, that Vorholt could adjust to new available work, was not required by the regulations and represents an alternative ground of decision.

On September 22, 2009, the district court issued granted summary judgment in favor of the Commissioner. The district court held that the ALJ gave reasoned explanations for her decision to give Baluyot's and Klein's opinions little weight, and that substantial evidence supported that explanation. The court further held that the ALJ properly relied on the opinion of the state agency physician, and that substantial evidence supported the ALJ's determination of Vorholt's RFC.

Vorholt filed this timely appeal, and this court has jurisdiction to review the final decision of the district court. 28 U.S.C. § 1291.

II

A

The Commissioner's conclusions are subject to a narrow standard of review and must be affirmed "absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence is relevant evidence that a "reasonable mind might accept . . . as adequate to support a conclusion," and if substantial evidence exists to support the Commissioner's conclusion, this court must affirm that conclusion "even if there is substantial evidence . . . that would have supported an opposite conclusion." *Ibid.* (citations omitted).

The regulations provide specific guidance on the weight an ALJ should give to medical opinions. 20 C.F.R. § 404.1527(d)–(e). The medical opinion of a treating provider must be given controlling weight as long as it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimaint's]

case record . . . ." 20 C.F.R. § 404.1527(d)(2). Where an ALJ chooses not to grant a treating

physician's opinion controlling weight, the ALJ "must articulate 'good reasons'" for doing so. *Ibid.*;

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009). And, generally, the opinion of an

examining doctor is given more weight than a non-examining doctor. 20 C.F.R. § 404.1527(d)(1).

Finally, while medical experts may opine on a claimant's limitations, "the ultimate decision of

disability rests with the [ALJ]." *White*, 572 F.3d at 286 (quoting *Walker v. Sec'y of Health and

Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992)); 20 C.F.R. § 404.1527(e)(1).

B

Vorholt argues that the ALJ lacked substantial evidence to support her decision to discount

the medical opinions, which were favorable to Vorholt's disability claim, from Vorholt's treating

physicians. Specifically, Vorholt claims that the ALJ lacked substantial evidence to conclude that

she had a "current" substance abuse problem. And therefore, Vorholt argues, the ALJ lacked

substantial evidence to conclude that the favorable opinions should be given little weight because

they did not sufficiently address her substance abuse problem. We hold that substantial evidence

clearly supported—and perhaps even compelled—the ALJ's conclusion that Vorholt had a relevant

substance abuse problem and, therefore, that the ALJ properly afforded little weight to the favorable

medical opinions.

The record below plainly supports the ALJ's finding that Vorholt's drug use played a role

in her symptoms. Indeed, Vorholt's medical history manifests routine noncompliance with

prescribed treatments and a continuing abuse of both prescription drugs and narcotics. Nearly every

medical record contains evidence of drug abuse and drug-seeking behavior, and the ALJ thoroughly documented both this evidence and the drug-related concerns of Vorholt's many treating physicians. Vorholt argues that there is no evidence to support the ALJ's finding that Vorholt suffers from a "current" substance abuse problem, but this argument fails. First, the record does—plainly—support such a finding. The ALJ's hearing took place on December 11, 2006, and the record contained evidence of substance abuse as recently as two months earlier, which is sufficient evidence for the ALJ to properly infer that Vorholt continued to battle a drug problem. Second, the ALJ's decision to grant the treating physicians' opinions little weight was based on the fact that the opinions did not sufficiently address Vorholt's drug abuse while they were treating her, not at the time the ALJ made her decision.

The relevant inquiry, then, is whether substantial evidence supports the ALJ's finding that Vorholt was affected by a drug problem while under the care of Drs. Klein and Baluyot, and it unmistakably does. Baluyot's opinion was written in October 2004, and the record during this time period and earlier—while Vorholt was under Dr. Baluyot's care—contains ample evidence of drug use and the effects of that drug use on Vorholt's psychological symptoms.[2] Dr. Klein's opinion was written in August 2006, and at that time, Dr. Klein herself was certainly aware of Vorholt's drug problems. For example, that same month, Klein reported that Vorholt had run out of Lorazepam early, and the previous year, Klein concluded that Vorholt's drug usage was connected with her

---

[2]In her brief, Vorholt argues that she used drugs only briefly in late 2003 and during the summer of 2006. Appellant's Br. at 19. In light of the record, which establishes that Vorholt routinely consumed large quantities of drugs, this claim is stunning.

mania. That neither doctor addressed these problems in any meaningful way was more than substantial evidence to support the ALJ's decision to grant their opinions little weight. *White*, 572 F.3d at 286 (holding that an ALJ's finding that a medical opinion conflicts with other evidence in the record is a sufficient reason to discount the opinion); 20 C.F.R. § 404.1527(c)(2) ("If any . . . medical opinion(s) is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence . . . ."); *id*. at § 404.1527(d)(4) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Although Vorholt does not fully explain her argument that the ALJ erroneously granted little weight to the opinion of Dr. Deters, the same analysis applies. Substantial evidence in the record supports the conclusion that Vorholt had a serious drug problem at the time Deters examined her, and as the ALJ found, Deters appeared to rely on the false record supplied by Vorholt. Further, the ALJ also determined that Deters's opinion was internally inconsistent, which is an independent reason for granting it little weight. As is the case with her treatment of Drs. Klein's and Baluyot's opinions, the ALJ exhaustively explained her reasons for granting little weight to Dr. Deters's opinion, thereby fulfilling her obligation under the regulations. 20 C.F.R. § 404.1527(d)(2).

Importantly, although the record could conceivably support a determination to grant disability benefits, the Social Security Act, 42 U.S.C. § 403(g), does not permit the reviewing court to "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Our review is limited to determining whether substantial evidence supports the ALJ's conclusion, even if it would also support a contrary conclusion. *Longworth*, 402 F.3d at 595. Here, the record overflows with

evidence that could support the ALJ's conclusion. We therefore hold that substantial evidence in the record supports the ALJ's findings that a serious drug problem affected Vorholt's symptoms and that, notwithstanding her underlying psychological problems, she remained capable of performing her past relevant work. Further, because the ALJ articulated the problems with the contrary medical opinions, she properly granted them little weight.

## III

For the foregoing reasons, we AFFIRM the decision of the district court.